IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-19-111-R |
| | ) | |
| JASON SCOTT PEDRO, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

Jason Scott Pedro, through counsel, William P. Earley, submits this Sentencing Memorandum addressing the statutory factors set forth in 18 U.S.C. §3553(a). The Presentence Report currently provides an advisory sentencing guideline range of imprisonment of 51 to 63 months. There is one objection to the guideline calculation that could result in a significant reduction in the range of imprisonment. Counsel submits a sentence well-below the currently calculated range is warranted under the totality of the circumstances and will more than satisfy the statutory goals of sentencing under the facts of this case.

The primary directive in §3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." In determining whether and to what extent imprisonment is appropriate the Court is required to "recogniz[e] that imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a) (emphasis added).

## NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

*Nature and circumstances of the offense*

The specific acts concerning the offense of conviction are addressed in paragraphs 7 through 9 of the Presentence Report (hereinafter PSR). Mr. Pedro was found in possession of the lower receiver of a firearm and extended magazines after a traffic stop.

*History and characteristics of the defendant*

The history and characteristics of Mr. Pedro are recounted in the offender characteristics section of the Presentence Report. Mr. Pedro's childhood seems to have been somewhat normal. His mother describes the household in which Mr. Pedro grew up as financially stable and sufficient to meet basic needs. She goes on to advise that around the age of fifteen she started having trouble with Mr. Pedro.

There are no obvious circumstances in the home or elsewhere that explain Mr. Pedro's resort to antisocial activity in his mid-teens. Mr. Pedro advised that during this period he was very insistent that his mother disclose the name of his biological father. Although his stepfather was a good man and a good father, Mr. Pedro wanted to know about his heritage. Mr. Pedro's mother refused to provide him any information. Her stance has not changed all these years later. *See PSR ¶79.*

Mr. Pedro rebelled against his mother. Up until the eighth grade Mr. Pedro described himself as an average student and a good athlete. He had no issues in school, other than an

inability to concentrate on school work. After eighth grade Mr. Pedro became addicted to methamphetamine.

At fourteen years old Mr. Pedro began to smoke methamphetamine on a regular basis. The juvenile matters referenced in the Presentence Report were the direct result of methamphetamine use. Mr. Pedro's mother tried to convince him to go to counseling at this time, but he refused. Because he was in juvenile custody off and on from age 15 to 18, he fell behind in school. He was held back three times after eighth grade and eventually quit school. Although he was evaluated in various juvenile facilities, Mr. Pedro does not recall being diagnosed with any particular disorder.

Mr. Pedro's methamphetamine addiction only worsened after turning 18. He continued to engage in antisocial activity with other drug dependent individuals. *See PSR ¶31*. Mr. Pedro recognized the destructive nature of his addition at age 20 and sought help. *See PSR ¶93*. Unfortunately, he was unable to maintain sobriety. Mr. Pedro struggled to comply with the conditions of supervision imposed on him in 2001 and engaged in numerous misdemeanor offenses over the next few years. In 2004 additional serious criminal activity resulted in Mr. Pedro receiving an eight year term of imprisonment. *See PSR ¶44*.

Mr. Pedro commenced service of the eight year prison term at age 23. Mr. Pedro served six of the eight years imposed. As a young man, Mr. Pedro was a natural target for older inmates seeking to exploit novice prisoners. Mr. Pedro learned early and often the

value of protecting himself and isolating himself. He recalls two things he got out of serving this term of incarceration - violence and continued drug use.

Mr. Pedro's substance abuse issues continued to plague him when released. He struggled maintaining sobriety and he struggled trying to acclimate to life outside the confined violent spaces of prison. Mr. Pedro found it very difficult to acclimate himself to freedom. He was constantly on guard and found himself reacting with physical violence when confronted. To numb the effects of long term incarceration, he continued to abuse methamphetamine. Noteworthy is the fact that methamphetamine seemed to have a calming effect on him.[1]

Mr. Pedro returned to prison in 2014 where he remained until April of 2018. His return to prison was entirely substance abuse related. *PSR ¶57.* Mr. Pedro has not been accused of any violent acts for over five years, to include the period of time from his release until his arrest on the instant offense in February of this year. Although there are a number of accusations pending in state court, none include allegations of violence.

Mr. Pedro advised counsel he is most in need of supervision. Mr. Pedro advised he was provided no beneficial services while under the supervision of the Oklahoma Department of Corrections - both in and out of prison. Mr. Pedro is now 37 years old and he fears his children are on the same path he has been on. He understands what it is like to

---

[1] Many individuals who abuse methamphetamine suffer from Attention Deficit Disorder. The stimulant effect of methamphetmine mimics the therapuetic effects of stimulant drugs on Attention Deficit Disorder.

not know your father - he does not want his children to respond in the same negative way he did because they do not know their father. Mr. Pedro is most in need of post confinement counseling and treatment.

### THE NEED FOR THE SENTENCE IMPOSED

Congress has determined individuals who knowingly possess a firearm after conviction of a felony should be subject to a term of imprisonment from zero to ten years. *See* 18 U.S.C. §924(a)(2). Congress provided a zero to ten year range of statutory punishment to provide the sentencing court the ability to address mitigating or aggravating factors present in the individual case. The offense of conviction in the instant case involves the simple possession of a single part of a firearm and extended magazines.

Although there has been an increase in the advisory sentencing guideline calculation because of the presence of extended magazines, it is important to point out that Congress no longer prohibits the possession of high capacity magazines. The enhancement of the advisory sentencing guidelines based on this feature is a guideline aggravator, not a violation of the law.

None of the statutory factors this Court must consider lead to the conclusion that a sentence of ten years or more is warranted in this case. First, a sentence far less than ten years will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Mr. Pedro possessed a single part of a firearm that in and of itself is incapable of discharging ammunition. In fact, the part he possessed would

have to be combined with dozens of other parts before it could be considered capable of discharging ammunition. A lengthy sentence is not necessary to promote respect for the law. Finally, just punishment for this particular crime does not warrant a term of years.

Concerning the need to afford adequate deterrence to criminal conduct, the empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and

their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Mr. Pedro has not received comprehensive mental health or substance abuse treatment. It is apparent from his history and characteristics he suffers from both mental health and substance abuse disorders. Incarceration will not provide the treatment Mr. Pedro needs. The focus of this proceeding should be getting Mr. Pedro to the supervised release portion of his sentence as soon as possible. It is unlikely Mr. Pedro's state court cases will result in providing the rehabilitative programs he needs.

The treatment Mr. Pedro needs is most effectively and efficiently provided in a community setting. Supervision costs the taxpayers $4,472.00 per year compared to $37,448.00 per year for imprisonment. Even if the cost of mental health and drug rehabilitation services costs a few thousand dollars more annually, community supervision costs substantially less than imprisonment.

## THE KINDS OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED FOR THE APPLICABLE CATEGORY OF OFFENSE COMMITTED BY THE APPLICABLE CATEGORY OF DEFENDANT AS SET FORTH IN THE GUIDELINES

The Presentence Report provides an advisory guideline range of imprisonment of 51 to 63 months. *PSR ¶102*. This range was calculated using a total offense level of 17 and a criminal history category of VI. Counsel for Mr. Pedro has challenged the offense level computation. Mr. Pedro objects to the large capacity magazine base offense level enhancement. *See PSR ¶15; Addendum, objections to ¶15, 20, and 24*.

The Presentence Report writer responded to Mr. Pedro's objection citing *United States v. Davis*, 668 F.3d 576 (8th Cir. 2012). In *Davis*, the defendant objected to the increase of his offense level based on the large capacity magazine enhancement. The defendant was accused of possessing a 9 mm semi-automatic pistol and an extended length magazine with 21 rounds of 9mm ammunition. *Id*. at 576. The defendant argued the firearm was inoperable at the time it was possessed because the firearm had no trigger. Thus, the firearm did not have "the ability to fire many rounds without reloading . . . . at the time of the offense. *Id*. at 577.

The Court of Appeals rejected Davis' argument. The Court held that the firearm possessed by Davis was designed to expel and could be readily converted to expel a projectile thus meeting the definition of a firearm. Concerning the text of the enhancment, the Court held:

> The term "firearm" in Application Notes 1 and 2 must be given the same meaning, that is, the definition in 18 U.S.C. § 921(a)(3) which includes the many judicial decisions that have applied the definition to less-than-permanently inoperable weapons. *See United States v. Kowal*, 527 F.3d 741, 746–47 (8th Cir.), *cert. denied*, 555 U.S. 1038, 129 S.Ct. 612, 172 L.Ed.2d 468 (2008) ("When two statutory provisions employ the same word in close proximity, the 'normal rule ... that identical words used in different parts of the same act are intended to have the same meaning carries' even greater weight."). Moreover, the phrase, "because at the time of the offense," comes immediately before the condition that the large capacity magazine must be either (A) attached, or (B) in close proximity to, the semiautomatic firearm. This strongly suggests that the phrase was not intended to modify an earlier condition—that the firearm "has the ability to fire many rounds without reloading."

*Davis*, 668 F.3d at 579.

The Eight Circuit's strained reading of the application notes addressing the large capacity magazine enhancement in *Davis* is distinguishable from the instant case. The *Davis* decision relies on the definition of a firearm in 18 U.S.C. §921(a)(3)(A). Mr. Pedro's conviction clearly falls within the definition of a firearm in 18 U.S.C. §921(a)(3)(B). The application of the large capacity magazine enhancement is difficult to square with the definitions of a "firearm" in subsections §921(a)(3)(B) and (C), because many parts of a firearm, such as in the instant case, are not designed to expel a projectile and are not "readily" convertible to do so.

The piece of a firearm Mr. Pedro possessed is shown in Exhibit 1 (attached). The diagram shown in Exhibit 2 (attached) reflects the number and type of additional pieces that must be assembled to complete the lower receiver. Even then, the additional pieces incorporating the upper receiver, charging handle, bolt carrier, firing pins, and bolt must be added to make the original single piece possessed by Mr. Pedro close to being a "weapon [] which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. §921(a)(3)(A).

Further, the increase in the base offense level because the firearm had a high capacity magazine overstates the seriousness of the offense. The Violent Crime Control and Law Enforcement Act of 1994 (the Act), inter alia, created a new offense at 18 U.S.C. § 922(v) criminalizing the manufacture, transfer or possession of a "semiautomatic assault weapon" listed in 18 U.S.C. § 921(a)(30), and a new offense at 18 U.S.C. § 922(w) criminalizing the

transfer or possession of a "large capacity ammunition feeding device," defined as capable of accepting more than ten rounds. Both prohibitions carried a five year maximum term of imprisonment under 18 U.S.C. § 924(a)(1)(B). Pub. L. No. 103-322, §§ 110102, 110103, 108 Stat. 1796, 1996-99 (Sept. 13, 1994). The Act exempted from the ban large capacity magazines that had been manufactured on or before the effective date of the Act. At that time, there were approximately 25 million pre-ban large capacity magazines in the United States and another 4.7 million pre-ban large-capacity magazines were imported between 1995 and 2000.[2]

The Act directed the Sentencing Commission to "provide an appropriate enhancement" for a crime of violence or a drug trafficking crime "if a semiautomatic firearm is involved." Pub. L. No. 103-322, § 110501, 108 Stat. 1796, 2015 (Sept. 13, 1994). The Commission implemented the directive through an upward departure, § 5K2.17, p.s., for semiautomatic firearms with a magazine capacity of more than ten cartridges possessed in connection with a crime of violence or controlled substance offense. *See* USSG, App. C., amend. 531 (Nov. 1, 1995) ("This amendment addresses the directive in section 110501 of the Violent Crime Control and Law Enforcement Act of 1994 to provide an appropriate

---

[2] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, 1994-2003, Report to the National Institute of Justice, U.S. Dept. of Justice (June 2004), available at http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

enhancement for a crime of violence or a drug trafficking crime if a semiautomatic firearm is involved.").

In addition, the Commission amended § 2K2.1 to require the same enhanced base offense levels for possession of a "firearm described in . . . 18 U.S.C. § 921(a)(30)" as for possession of firearms described in 26 U.S.C. § 5845(a) (sawed-off shotguns, machine guns, bombs, silencers), when the firearm was not connected with a crime of violence or drug trafficking offense. *See* USSG, App. C, amend. 522 (Nov. 1, 1995). No reason was given, *id.*, but presumably it was to provide a guideline range for the new offense at 18 U.S.C. §922(v).

By the terms of the Act, the ban on semiautomatic weapons described in 18 U.S.C. §921(a)(30) and the ban on large capacity magazines were repealed on September 13, 2004. Pub. L. No. 103-322, § 110105, 108 Stat. 1796, 2000 (Sept. 13, 1994). A study mandated by Congress to be performed thirty months after enactment of the ban, *id.* §110104, concluded that, "[a]t best, the assault weapons ban can have only a limited effect on total gun murders, because the banned weapons and magazines were never used in more than a fraction of all gun murders," and that there was no detectable reduction "in two types of gun murders that are thought to be closely associated with assault weapons, those with multiple victims in a single incident and those producing multiple bullet wounds per victim."[3]

---

[3] See Roth, Koper, et. al, *Urban Institute, Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994* at 2, 97 (March 13, 1997), available at http://www.urban.org/UploadedPDF/aw_final.pdf.

Nonetheless, in 2006, the Commission voted to retain the enhanced base offense levels in §2K2.1(a)(1), (3) and (4); to broaden their reach from the specific list in former 18 U.S.C. §921(a)(30) to any "semiautomatic firearm that is capable of accepting a large capacity magazine," i.e., one with a magazine capable of accepting more than 15 rounds attached or in close proximity, USSG § 2K2.1, comment. (n.2); and to amend the definition in §5K2.17, p.s., to require more than 15 rounds. The only reason the Commission gave for retaining and expanding the enhanced base offense levels was that it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply . . . in light of the ban's expiration." USSG, App. C., amend. 691 (Nov. 1, 2006).

The Department of Justice recommended that the Commission use the upward departure only and not enhanced base offense levels "in light of the fact that possession of such firearms are no longer illegal per se."[4] The Commission never considered whether the increased base offense levels should apply at all in light of the repeal of the ban and the empirical evidence. The Commission left the enhancement intact citing no data and offering no explanation why it had any bearing on achieving the purposes of sentencing.

Indeed, there is no rationale grounded in empirical research or sentencing purposes for punishing possession of large-capacity magazines so severely. Large capacity magazines are legal to buy, sell and trade in most states. If there was any evidence that they were

_____

[4] DOJ Written Testimony at 26-27 (March 15, 2006), http://www.ussc.gov/hearings/03_15_06/Richard-Hertling.PDF.

especially dangerous or attractive to criminals, a political consensus would have developed to continue the ban on them. There is no such evidence, and no such consensus has developed. The fact that the assault weapons ban was allowed to expire in 2004 indicates a societal judgment that large capacity magazines should not be outlawed. In spite of that, the Commission chose to retain increased punishment not only for possession of firearms with magazines covered by the repealed ban, but for possession of firearms with magazines that were not covered by the ban even when it was in effect.

The guideline treats fifteen-plus round magazines the same as guns regulated under the National Firearms Act. Solely because of the presence of the magazine, the firearm is treated as the equivalent of a machine gun, sawed off shotgun, short-barreled rifle, or destructive device. *See* 26 U.S.C. § 5845(a). This creates unwarranted uniformity. *See United States v. Serna*, 435 F.3d 1046, 1049 (9th Cir. 2006) ("We find more significant the fact that, when the federal assault weapon ban ended, Congress didn't require previously-banned semiautomatic weapons to be registered. The fact that semiautomatic weapons are not now, nor have ever been, subject to a blanket registration requirement suggests that mere possession of them does not pose the same risk of physical injury as possession of weapons subject to a blanket federal registration requirement-like silencers and sawed-off shotguns.").

Because the large capacity magazine provision was not based on empirical data or national experience and recommends a sentence that is greater than necessary to reflect the

seriousness of the offense, to deter others, or to prevent any further crimes, the Court should vary from the guideline range by at least an equivalent number of levels.

Mr. Pedro is a prohibited person pursuant to USSG §2K2.1(a)(6), thus his base offense level for the instant offense should be 14 without reference to the high capacity magazine adjustment. The total offense level should be 12 after the reduction for acceptance of responsibility. Combined with a criminal history category of VI, a total offense level of 12 yields an advisory guideline range of imprisonment of 30 to 37 months.

### PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION

Mr. Pedro submits a departure or variance below the calculated sentencing guideline range is warranted should the Court overrule his objection to the offense level calculation. As discussed above, a sentencing guideline range calculated on a base offense level derived from application of the high capacity magazine enhancement overstates the seriousness of the instant offense. The Sentencing Commission continues to recognize that "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *USSG §1A1.1, Editorial Note (previously Part A of Chapter One)*. When a base offense level or specific offense characteristic or adjustment to the offense level calculation is excessive given the facts of a particular case, a departure is not prohibited on this ground. *See United States v. Sicken*, 223 F.3d 1169, 1175 (10th Cir. 2000). This same logic applies to a decision to vary from the advisory range.

As it concerns grounds to depart or vary above the guideline range based on inadequacy of criminal history, this Court must find "the defendant's criminal history category substantially under- represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes" before a departure or variance is warranted.  *See USSG §4A1.3(a)*.  Mr. Pedro's criminal history does not meet that threshold.

### THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

Disparity is difficult to quantify in any case.  Facts and circumstances unique to the defendant and the alleged criminal activity often distinguish to a substantial degree one case from another.

### NEED TO PROVIDE RESTITUTION

Restitution is not an issue in this case.

### CONCLUSION

A sentence well-below the advisory sentencing guideline range currently calculated is justified under the facts and the statutory factors this Court must consider.

Respectfully submitted,
*s/ William P. Earley*
WILLIAM P. EARLEY
ASSISTANT FEDERAL PUBLIC DEFENDER
Bar Number 11293
SUITE 109, 215 DEAN A. McGEE AVENUE
OKLAHOMA CITY, OKLAHOMA  73102
(405) 609-5930   FAX (405) 609-5932

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 25th day of October, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrants: Mary Walters, Assistant United States Attorney.

*s/ William P. Earley*
WILLIAM P. EARLEY